FILED
NOV 20 2013
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. **4:13CR486 HEA/SPM** |
| TINA L. KUEHL and BABY BOOMERS HEALTH, LLC, dba A BETTER WAY HOME CARE, | ) ) ) ) ) |
| Defendants. | ) ) |

### INDICTMENT

The Grand Jury charges that:

### COUNTS 1 and 2
### Health Care Fraud Scheme
### Title 18, U.S.C., Section 1347(a)(1) and Section 2

### INTRODUCTION

1.   At all times relevant to this indictment, defendant Baby Boomers Health, LLC, doing business as A Better Way Home Care (referred to hereafter as Better Way), was a home health care agency located at 15332 Manchester Road, Suite 201, Ellisville, Missouri. Better Way was incorporated in Missouri in 2006.

2.   At all times relevant to this indictment, defendant Tina L. Kuehl was the owner, president, and administrator of Better Way and was responsible for the day to day operations of Better Way.

3.   Better Way has been an approved Medicare provider since 2005.

### State Licensing and Monitoring of Home Health Care Agencies

4.      A home health care agency must be licensed by the state in which the agency provides services. In Missouri, the Department of Health & Senior Services (DHSS) is responsible for the initial certification and licensure of home health care agencies and for monitoring the agencies thereafter. DHSS works in conjunction with the Centers for Medicare and Medicaid Services to ensure that the home health care agencies comply with state and federal regulations governing home health care agencies.

5.      After an initial inspection, DHSS approved Better Way's application for a state license on or about December 6, 2005. This license is renewed on a yearly basis and was most recently renewed on September 1, 2012.

### Medicare Provider Enrollment & Participation

6.      The Medicare Program is a federal health benefits program, primarily for the elderly and disabled. Medicare reimburses enrolled health care providers for covered health services that are provided to eligible Medicare beneficiaries. The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services (CMS), administers the Medicare Program. CMS acts through fiscal agents called Medicare Administrative Contractors (MACs), which are statutory agents for CMS.

7.      To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful

2

completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

8. As part of the application process, defendant Kuehl, on behalf of Better Way, signed a CMS-855A form that informed her of the penalties for falsifying information to gain or maintain enrollment in the Medicare program, as well as the penalties for falsifying information when seeking reimbursement from the Medicare program. The following notice was included:

> 18 U.S.C. 1001 authorizes criminal penalties against an individual who, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willingly falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry.

9. The Medicare provider enrollment application further states, under Section 15, Certification Statement, items #7 and #8:

> I understand that the Medicare billing number issued to me can only be used by me or by a provider or supplier to whom I have reassigned my benefits under current Medicare regulations, when billing for services rendered by me. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

10. In 2005, 2006, and again in 2012, defendant Kuehl, in her capacity as president and vice-president of Better Way, signed CMS Form 855 (Section 15), which states: "I have read the contents of this application. My signature legally and financially binds this provider to the laws, regulations and program instructions of the Medicare program."

11. After successful completion of the application process, the MAC assigned Better Way a unique provider number, which Better Way thereafter used to bill Medicare.

12. Medicare providers must retain clinical records for the period of time required by state law or five years from date of discharge if there is no requirement in state law.

### Medicare Reimbursement for Home Health Care

13. As stated above, the MACs are private entities that act as fiscal agents for CMS. The MACs review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic area, including determining whether the claim is for a covered service. CGS Administrators LLC (CGS) is the Home Health and Hospice MAC for Eastern Missouri and thus processes Better Way's claims for Medicare reimbursement.

14. Medicare typically pays home health agencies for 60 day episodes of care. Medicare makes two payments to the home health care agencies, the first before the service is provided and a second payment at the end of the 60 day episode of care. To obtain the partial initial payment, a health care agency must submit a Request for Anticipated Payment (RAP), which is based on the anticipated services to be provided to a particular patient. Medicare then pays the home health care agency 60% of the total amount that Medicare will pay for services to the patient.

15. The second and final payment for the episode of care is based on the actual number of services provided to the patient. This payment may be more or less than 40% of the amount originally calculated for the 60 day episode of care. The home health care agency will be paid less than 40% if the agency did not provide the number of visits listed on the Outcome and Assessment Information Set (OASIS) form.

16.     Medicare will reimburse for home health care services only if the patient needs the services.  A prospective patient may contact a home care agency directly or may be referred by a health care professional.  In all instances, the home health care agency must determine if the patient needs the services and the type and frequency of the services.  The OASIS is a detailed, patient specific, data collection form, which is used to document the patient's health status and the patient's need for home health.  The patient's condition, clinical severity, functional status, and care and therapy needs are documented on the OASIS form.

17.     The home health care agency then inputs the information from the OASIS form into the Havens software, which generates a health insurance prospective payment system (HIPPS) code.  The HIPPS code determines the reimbursement rate and is placed on the reimbursement claim submitted to Medicare.

18.     Medicare considers a number of factors in determining the reimbursement rate for home health care services:  the patient's medical diagnoses, functional limitations, and the number and type of services the patient needs.  The higher the number of services and the anticipated cost to provide the services, the more Medicare pays for the care of a patient.

19.     Home health care agencies typically submit reimbursement claims electronically. Better Way chose to submit its claims electronically and to receive payments by electronic funds transfer or "direct deposit."

## DESCRIPTION OF HEALTH CARE FRAUD SCHEME

### Falsification of the OASIS Forms

20.     Better Way hired nurses and contracted with therapists to assess and evaluate

patients and to determine the patients' need for skilled nursing care and various therapies. Defendant Kuehl has no medical or health care education, training, or experience, which would qualify her to assess or evaluate patients or determine their care needs. Prior to opening Better Way, defendant Kuehl worked in the cosmetology field.

21. Better Way was required to employ or contract with professional nursing staff, who were responsible for insuring that patient assessments were properly conducted, the OASIS forms were correctly completed, and the prescribed services were provided. The OASIS form included a section where the nurse or therapist listed the number of skilled nursing or therapy visits that they anticipated the patient would need during the 60 day episode of care.

22. It was part of the scheme and artifice to defraud that defendant Kuehl directed Better Way nurses and other employees to make false statements on the OASIS forms to increase the reimbursement that Better Way would receive. Some examples are listed below.

23. Registered nurse D.L. worked at Better Way during 2009 and 2010 and was the director of nursing during his or her employment there. It was part of the scheme and artifice to defraud that defendant Kuehl directed D.L. to increase the number of therapy visits on the OASIS form, although defendant Kuehl knew the patients did not need the therapy.

24. Registered nurse S.D. worked for Better Way in 2009 and 2010. As part of the scheme and artifice to defraud, defendant Kuehl directed S.D. to increase the number of therapy visits to 13. Defendant Kuehl also directed S.D. to change the patients' ADL (activities of daily living) score on the OASIS. The ADL refers to the patients' ability to walk, transfer between a bed and a chair, bathe, use the toilet, etc.

25. As part of the scheme and artifice to defraud, during 2011, defendant Kuehl directed J.N., the director of nursing at the time, to indicate on the OASIS forms that patients needed more therapy visits than they actually needed.

26. Employee D.D. worked for Better Way for about three years and left in 2012. As part of the scheme and artifice to defraud, defendant Kuehl directed D.D. to enter into the computer a greater number of the visits than the nurse or therapist had listed on the OASIS forms. In some instances, defendant Kuehl directed D.D. to increase the number of visits to 20, which was more than twice what the nurse or therapist had listed on the OASIS form.

27. Registered nurse J.F. was responsible for selecting diagnosis codes, which accurately reflected the patients' condition and the reason the patients were receiving home health care services from Better Way. As part of the scheme and artifice to defraud, defendant Kuehl directed J.F. to list as the primary diagnosis the one that would result in a larger payment to Better Way.

**Falsification of Billing Worksheets**

28. Medicare required Better Way to document the number of therapy visits in writing and this information was included in the patient's medical record. At the end of the 60 day episode of care, Better Way staff reviewed the medical record and counted the actual nursing and therapy visits documented in the patient medical record. The date and type of visits were then recorded on a form called a billing work sheet.

29. Employee A.M. worked for approximately six months for Better Way and at times was responsible for preparing the billing work sheets. It was part of the scheme and

artifice to defraud that defendant Kuehl directed A.M. to indicate that the therapy visits lasted longer than reflected in the patient medical records.

30. When some employees refused to increase the number of therapy visits, defendant Kuehl personally increased the number of visits. In some instances the patient had received no therapy at all.

### Submission of False Reimbursement Claims

31. Better Way contracted with an outside biller to submit reimbursement claims to Medicare. Billing work sheets were faxed to the biller; on other occasions the biller received the billing work sheets directly from defendant Kuehl. After submitting the claims, the biller returned the worksheets and related claims to Better Way.

32. It was part of the scheme and artifice to defraud that defendant Kuehl told the biller that she had found therapy visits which had not been billed. Defendant Kuehl directed the biller to submit claims for the "found" therapy visits, when defendant Kuehl knew the patients had not received therapy.

33. Some Better Way employees questioned defendant Kuehl when she directed them to submit claims for which there was no documentation. It was part of the scheme and artifice to defraud that defendant Kuehl told them that she had contacted the therapy company and verified that the therapy had been provided. Defendant Kuehl knew that these statements were false.

34. It was part of the scheme and artifice to defraud that defendants Kuehl and Better Way caused the submission of hundreds of reimbursement claims to Medicare for services which they knew had not been provided. In numerous instances, neither the patient medical record at

Better Way nor the records of the therapy company document any service on the dates listed on the false reimbursement claims. Examples of some of these false claims are listed below:

|   | Patient | Care Dates | Number of Therapy Visits Billed | Number of Therapy Visits Provided |
|---|---------|------------|---------------------------------|-----------------------------------|
| a. | B.E. | 04/29/11 to 06/27/11 | 18 | 1 |
| b. | A.F. | 03/09/11 to 04/04/12 | 56 | 1 |
| c. | A.G. | 08/23/11 to 10/21/11 | 21 | 0 |
| d. | C.G. | 08/29/11 to 01/27/12 | 37 | 7 |
| e. | D.G. | 05/04/11 to 06/29/11 | 23 | 0 |
| f. | L.G. | 06/08/11 to 08/06/11 | 21 | 0 |
| g. | R.G. | 06/08/11 to 10/04/11 | 33 | 6 |
| h. | M.H. | 11/08/11 to 03/08/12 | 16 | 0 |
| i. | R.H. | 12/22/10 to 02/18/11 | 22 | 1 |
| j. | M.J. | 05/06/11 to 07/04/11 | 21 | 0 |
| k. | M.L. | 07/05/11 to 11/01/11 | 36 | 0 |
| l. | J.M. | 07/22/11 to 09/19/11 | 13 | 1 |
| m. | N.S. | 06/09/11 to 07/30/11 | 23 | 0 |
| n. | C.V. | 12/01/11 to 03/29/12 | 37 | 2 |
| o. | D.W. | 08/19/11 to 02/14/12 | 42 | 3 |

### Execution of the Health Care Fraud Scheme

35. On or about the dates indicated below, in the Eastern District of Missouri,

**TINA L. KUEHL and**
**BABY BOOMERS HEALTH, LLC,**
**dba A BETTER WAY HOME CARE,**

the defendants herein, knowingly and willfully executed and attempted to execute, the above described scheme and artifice to defraud a health care benefit program, in connection with the delivery and payment for health care benefits, items, and services, that is, the defendants submitted and caused to be submitted, reimbursement claims to the Medicare Program, a health care benefit program, which claims falsely represented that Better Way had provided more therapy services than were actually provided:

| Count | Patient | Care Dates | Number of Therapy Visits Billed | Number of Therapy Visits Provided | Final Claim Date |
|---|---|---|---|---|---|
| 1. | C.V. | 12/01/11 to 03/29/12 | 37 | 2 | 04/26/12 |
| 2. | D.W. | 08/19/11 to 02/14/12 | 42 | 3 | 02/13/12 |

All in violation of Title 18, United States Code, Section 1347(a)(1) and Section 2.

### COUNTS 3-5
### False Statements Involving
### Health Care Benefit Plan
### Title 18, United States Code, Section 1035(a)(1) and Section 2

36. Paragraphs 1-34 are incorporated by reference as if fully set out herein.

37. On or about the dates indicated below, in the Eastern District of Missouri,

10

TINA L. KUEHL and
BABY BOOMERS HEALTH, LLC,
dba A BETTER WAY HOME CARE,

the defendants herein, in a matter involving a health care benefit program, knowingly and willfully made and used, and caused to be made and used, materially false writings and documents knowing the same to contain materially false, fictitious, and fraudulent statements and entries in connection with the delivery of and payment for health care benefits, items, and services, in that the defendant represented on billing work sheets that patients had received therapy services when the defendants knew that the patients had not received the therapy.

| Count | Patient | Dates of Service | Number of Therapy Visits Billed | Number of Therapy Visits Provided | Final Claim Date |
|---|---|---|---|---|---|
| 3. | B.E. | 04/29/11 to 06/27/11 | 18 | 1 | 08/08/11 |
| 4. | A.G. | 08/23/11 to 10/21/11 | 21 | 0 | 01/18/12 |
| 5. | L.G. | 06/08/11 to 08/06/11 | 21 | 0 | 11/18/11 |

All in violation of Title 18, United States Code, Section 1035(a)(1) and Section 2.

## COUNT 6
### False Statements To Federal Agency
### Title 18, United States Code, Section 1001(a)(2) and Section 2

38. Special Agent Linda Hanley is a federal agent of the U.S. Department of Health and Human Services, Office of the Inspector General, Office of Investigations (HHS/OIG), which is responsible for investigating allegations of fraud in the Medicare Program. Special Agent Hanley was one of the federal agents investigating allegations that the defendants were submitting fraudulent claims to Medicare.

11

39. On or about October 24, 2012, Special Agent Hanley interviewed defendant Kuehl and asked her about the fraud allegations against her and Better Way. Defendant Kuehl falsely stated that she did not have anything to do with billing for Better Way services, did not know how the numbers got on the work sheets, and did not know the meaning of the numbers on the worksheets.

40. During the interview on February 13, 2013, defendant Kuehl falsely represented to Special Agent Hanley that she had cancer and for that reason was often out of the office and unaware of the day to day operations of Better Way. Defendant Kuehl's statement that she had cancer was false, which Special Agent Hanley discovered only after an expenditure of considerable time and resources.

41. On or about October 24, 2012, and February 13, 2013, in the Eastern District of Missouri,

**TINA L. KUEHL,**

the defendant herein, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations to HHS/OIG Special Agent Hanley, concerning a matter within the jurisdiction of HHS/OIG, an agency within the executive branch of the United States.

All in violation of Title 18, United States Code, Section 1001(a)(2) and Section 2.

### FORFEITURE ALLEGATIONS

The Grand jury further finds by probable cause that:

42. Pursuant to Title 18, United States Code, Sections 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Sections 1347 and 1035 as set forth in

Counts 1 through 5, the defendants shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from gross proceeds traceable to the commission of the offenses.

43. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offenses.

44. If any of the property described above, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

                              A TRUE BILL.


                              _____
                              FOREPERSON

RICHARD G. CALLAHAN
United States Attorney


_____
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney